**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS.   A-2286-18
                         A-2702-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent/
     Cross-Appellant,

v.

MARTEL D. CHISOLM, a/k/a
MANTEL CHISOLM and
LAMONT M.WILLIAMS,

     Defendant-Appellant/
     Cross-Respondent.

_____

STATE OF NEW JERSEY,

     Plaintiff-Respondent,
v.

DEMETRIS CROSS,

     Defendant-Appellant.

_____

Submitted April 12, 2021 – Decided May 7, 2021

Before Judges Sabatino, Currier and Gooden Brown.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Indictment No. 17-02-0327.

Joseph E. Krakora, Public Defender, attorney for appellant Martel D. Chisolm (Frank M. Gennaro, Designated Counsel, of counsel and on the briefs).

Joseph E. Krakora, Public Defender, attorney for appellant Demetris Cross (Richard Sparaco, Designated Counsel, of counsel and on the brief).

Damon G. Tyner, Atlantic County Prosecutor, attorney for respondent (John J. Lafferty, IV, Assistant Prosecutor, of counsel and on the brief in A-2286-18; Melinda A. Harrigan, Assistant Prosecutor, of counsel and on the brief in A-2702-18).

PER CURIAM

Tried together by a jury, co-defendants Demetris Cross and Martel D. Chisolm were found guilty of the attempted murder of two police officers, armed robbery with a deadly weapon, conspiracy to commit armed robbery, aggravated assault with a firearm, and various other related offenses.

At trial, the State presented evidence that co-defendants and a third individual, Jerome Damon, committed armed robbery of three other young men. Two Atlantic City Police Officers came upon the scene and attempted to stop the robbery. Damon fired a gun at both officers, severely injuring one in the head. Damon died after he was shot by police during his flight from the scene.

2

The trial court sentenced each of the co-defendants to an aggregate custodial term of thirty-two years, subject to an eighty-five-percent parole ineligibility period required by the No Early Release Act ("NERA"), N.J.S.A. 2C:43-7.2. The thirty-two-year aggregate period was comprised of a seventeen-year sentence for the attempted murder of the police officer who was shot in the head, plus a consecutive sentence of fifteen years for the armed robbery. Defendants also received a fifteen-year sentence for the attempted murder of the other officer, who was fired at but not injured, to run concurrent to the other attempted murder sentence. All the other offenses were either merged into the attempted murders or were accorded concurrent sentences.

In their appeals, which we consolidate for purposes of this opinion, defendants mainly contend the evidence was insufficient to make them accomplices to murders attempted by Damon. They contend the State did not establish they shared an intent with Damon to fire his gun at and try to kill the two officers. In a related vein, defendants argue the trial court's jury instructions on accomplice liability were muddled, and that the jury charge was also flawed in other respects. Defendants raise other points seeking to set aside their convictions and sentences.

A-2286-18

The State, meanwhile, appeals Chisolm's sentence, contending the court should have imposed upon him a mandatory extended term pursuant to the Graves Act, N.J.S.A. 2C:43-6(c).

For the reasons that follow, we reverse each of co-defendants' convictions for attempted murder because there is no proof beyond a reasonable doubt that they shared an intent with Damon to shoot his gun at and kill the two police officers. In fact, the State's briefs on appeal identify no such proof of a shared intent to kill.

Although the briefs discuss an alternative theory of whether co-defendants were guilty of a conspiracy to commit attempted murder, the jury was not charged with such a conspiracy and the verdict form reflects no such finding of guilt. Consequently, the matter must be remanded for revision of the judgments of conviction to eliminate the attempted murder counts, and defendants must be resentenced. In addition, we agree with the State that Chisolm is subject to an extended term under the Graves Act, which must be taken into account at the resentencing.

We discern no merit to the remaining points raised on appeal, and thus affirm defendants' convictions on all other charges.

I.

The State's proofs at trial may be summarized as follows. During the early morning of September 3, 2016, Jaquan Campos, K-Vaun Wyatt,[1] and Tyrone Ford were walking down Pacific Avenue in Atlantic City, when three men approached them and asked Wyatt "something about some weed." The parties did not exchange marijuana.

Campos, Wyatt, and Ford started to walk away when the three men approached them again. During this second encounter, one of the men drew a gun.

Around this time, Officers Thomas McCabe and Josh Vadell of the Atlantic City Police Department were patrolling the area of Pacific and Atlantic Avenues in Atlantic City. The officers were driving near Arkansas Avenue at approximately 2:15 a.m., when they saw what appeared to be a robbery in progress.

Officers McCabe and Vadell both testified they saw a man with his hands on his head and his pants around his ankles, with a gun pressed to his head by a different man. They also saw two younger men seated or kneeling on the ground to the left of the man with the gun. McCabe saw two other men standing nearby;

---

[1] By the time of trial, Wyatt had died.

A-2286-18

one wearing a bright green t-shirt, later identified as Chisolm, and a taller man wearing a hoodie sweatshirt, later identified as Cross.

The officers got out of the car and the man with his hands on his head said to them, "Yo, they're robbing us." According to McCabe, he "locked eyes" with the suspect wearing the bright green t-shirt, who then started to run down an alleyway. McCabe started to chase him but heard a gunshot.

Damon, the man who had been holding the gun that fired the shot, then ran in a different direction than the man in the green shirt. Damon shot at McCabe while he was running away. McCabe returned fire and did not know until later that he had hit Damon.

Once McCabe lost sight of Damon, he turned his attention to his fellow officer, Vadell, who had been shot in the head, and radioed for help. Vadell underwent multiple surgeries to treat his injury, including a craniotomy.

Another police officer, Joseph Bereheiko, testified he found Damon laying on his side in an elevated planter on Missouri Avenue, holding a cell phone in his hand. As the officers were putting Damon in handcuffs, his cell phone rang and Bereheiko saw the letters "C-H-I."

Damon died shortly thereafter from the gunshot wound. Police found an envelope containing $485.10 on his body. The officers also found a .38 caliber

A-2286-18

special revolver in a parking lot near Missouri and Atlantic Avenues. Damon's fingerprints were on the gun.

Detective Lance Moorhouse of the New Jersey State Police testified that he reviewed surveillance video footage from Bally's Casino. The video showed "a black male," later identified as Cross, "running from the southwest corner of Michigan Avenue into the Bally's bus terminal" between approximately 2:30 and 2:33 a.m. The runner was wearing a dark-colored sweatshirt, sweatpants with white knee patches, and had a "dread style haircut." The video showed Cross had unzipped his sweatshirt, revealing a white t-shirt. Moorhouse testified he found in the trashcan of the bus terminal a sweatshirt, which matched the one in the video.

Video surveillance from the Claridge Casino also showed the "same black male with the dreadlock hairstyle wearing a white tee-shirt" leaving the bus terminal and boarding a jitney bus.

Detective Joseph Procopio of the Atlantic City Police Department testified he made flyers with photos of the suspects involved in the incident in hopes of identifying them. In addition to the surveillance video, Procopio also looked at Damon's Facebook account and his public list of Facebook "friends." From that list, Procopio found Chisolm, and he then looked through Chisolm's public

A-2286-18

photos posted on his Facebook account. Procopio testified that someone in one of Chisolm's photos looked similar to the other man in the surveillance video, specifically Cross.

FBI Special Agent John Hauger, assigned to the Cellular Analysis and Survey Team, testified for the State as an expert historical cell site analyst. Defense counsel objected to Special Agent Hauger's testimony, arguing that he had not contacted the phone company to discuss the interpretation of the phone records. The court ruled that the basis of the objection could be addressed on cross-examination.

Hauger testified that he analyzed the records for Chisolm's phone number, and that there were calls that connected to the tower near the former Trump Plaza Hotel at 2:00 a.m. and a little after 3:00 a.m. Hauger testified that the first incoming call to Chisolm after 2:30 a.m. was from Damon's phone number, and the first outgoing call after 2:30 a.m. was made at 3:44 a.m. to an unidentified number. Hauger stated that the general path of Chisolm's cell phone traveled from Atlantic City to Pleasantville, then Millville, and then Vineland.

Campos, one of the men who had been robbed, testified in the State's case but provided limited details as to what occurred. He recalled that someone pulled a gun, but he did not remember if there were any other individuals.

Campos denied that any of his property was taken. He had previously given a more detailed videotaped statement to police detectives on the same day of the incident, September 3. After a Gross[2] hearing at which the judge found it admissible, Campos's prior video interview with Detective Jason Dorn was played for the jury.

In that exchange, Dorn told Campos that police "know it wasn't you, okay?" Campos said that the three men approached him and his friends and asked to buy marijuana from Campos, but Campos told them he did not sell drugs. He stated that the three men then later reappeared and one of them said, "Don't move," and pulled out a gun. According to Campos, he put his hands up and said, "Listen, I don't got nothing. I'm going to strip for you. Shit like that, you can have all the shit." Campos removed his pants and laid down on the ground on his own accord.

According to Campos, the man dressed all in black and holding the gun, later identified as Damon, then walked over to Wyatt and robbed him. Campos said that another man with "dreads was looking out and (indiscernible) in the cap," and that the man in the green shirt had him by his shirt. He said the man

---

[2] State v. Gross, 121 N.J. 1, 10 (1990).

A-2286-18

dressed all in black was the one who shot the police officer. The man in the green shirt ran away.

Another one of the victims, Ford, also testified for the prosecution but similarly provided minimal information. The first day he was called to the stand, Ford stated that three men had approached him and his friends to ask about marijuana and that a gun was drawn, but then decided he no longer wanted to answer questions and had "nothing else to say." The second day Ford was called as a witness, he answered "no" to questions asking if he remembered if anyone approached him and his friends, if he remembered any guns, or if he talked to anyone.

After another admissibility hearing, Ford's own prior statement given to police on the date of the incident was played for the jury. Ford's mother was with him while he gave his statement, since he was fifteen at the time. Detective James Scoppa told Ford that the officers believed Ford was a victim in a robbery and that he was not in custody even though he read Ford his <u>Miranda</u>[3] rights.

Ford told the police that he was walking with his two friends and three men approached them and asked for marijuana. They encountered the three men again, who asked for marijuana a second time. Ford then saw one of the men

---

[3] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

take out a gun. Ford said he threw forty-five dollars on the ground and that another man checked to see if he had any more money or any other items on him. Ford was sitting on the ground on his knees with his hands up with another one of his companions, while the other one was "on the floor at gun point." It was at that time that the officers pulled up and Ford put his hands up and said, "We just got robbed."

Both defendants gave statements to the police. Scoppa interviewed Chisolm on September 3, the evening after the robbery. Scoppa testified that Chisolm said he was wearing a green shirt, camo shorts, and a hat during the early morning hours of September 3. According to Scoppa, Chisolm said he was aware of an incident. Chisolm said that Damon wanted to purchase marijuana and that an argument ensued, but the police arrived in the middle of it. Chisolm said that he ran away and then heard gunshots. He told Scoppa that he did not have a gun on him, that he did not see if Damon had a gun, and that he did not see Damon pull out a gun. Chisolm also denied taking anyone's property that night or seeing anyone take anyone else's property.

Sergeant William Adamson testified at trial about his interview with Cross. Cross told Adamson that he did not know Damon that well and that he did not know that Damon had a gun. According to Cross, he first realized that

11

Damon had a gun when he saw Damon "kind of motioning" and saw the men on the ground. However, Cross said he ran away before Damon brandished the gun and before Damon shot it. Cross said he had been wearing a darker sweatshirt, which he later threw in a trash can because he was scared.

Defendants did not testify at trial. Cross briefly called a forensic toxicologist, who attested that he found a toxic level of PCP (phencyclidine) in Damon's blood post-mortem. Cross also presented testimony from an Atlantic City police detective who described various details of the investigation, including the surveillance videos.

The jury convicted both defendants of fourth-degree aggravated assault by knowingly pointing a firearm at another person, N.J.S.A. 2C:12-1(b)(4) (count five), and conspiracy to commit such a fourth-degree aggravated assault, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:12-1(b)(4) (count six); two counts of first-degree attempted murder of the officers, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-3 (counts seven and eight); three counts of first-degree armed robbery with a deadly weapon, N.J.S.A. 2C:15-1(a) (counts nine, ten, and eleven); second-degree conspiracy to commit armed robbery, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:15-1(a) (count twelve); fourth-degree obstruction of the administration of

law, N.J.S.A. 2C:29-1 (count thirteen); and fourth-degree resisting arrest, N.J.S.A. 2C:29-2(a) (count fourteen).

The jury acquitted both defendants of various weapons offenses in counts one through four, which had charged them with second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b) (count one); second-degree conspiracy to unlawfully possess a handgun, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:39-5(b) (count two); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4 (count three); and second-degree conspiracy to possess a weapon for an unlawful purpose, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:39-4 (count four).

In light of the jury's not-guilty verdicts on the weapons offenses, the trial judge entered a judgment of acquittal for both defendants on the second-degree "certain persons not to have weapons" charges (count sixteen for Chisolm, count seventeen for Cross). At the same time, the court denied Chisolm's motion for a new trial and Cross's motion for acquittal.

The court then sentenced both defendants, imposing the aggregate thirty-two-year NERA sentences we have already described.

In his brief on appeal,[4] Chisolm makes the following points:

POINT I

DEFENDANT WAS IMPROPERLY CONVICTED OF TWO COUNTS OF ATTEMPTED MURDER BECAUSE THERE WAS NO EVIDENCE THAT HE HAD OR SHARED AN INTENT TO KILL ANY PERSON, BECAUSE CO-CONSPIRATOR LIABLILTY FOR THE ACTS OF JEROME DAMON CANNOT SUPPPORT A CONVICTION FOR ATTEMPT, AND BECAUSE THE JURY INSTRUCTIONS WERE CONTRADICTORY AND LOGICALLY INCONSISTENT.

POINT II

THE STATEMENTS OF TYRONE FORD AND JACQUAN CAMPOS WERE IMPROPERLY ADMITTED AS SUBSTANTIVE EVIDENCE.

POINT III

THE CONVICTIONS FOR FIRST DEGREE ROBBERY MUST BE VACATED, BECAUSE THE GRAND JURY INDICTED ON THREE COUNTS OF SECOND DEGREE ROBBERY.

POINT IV

THE EXPERT TESTIMONY OF JOHN HAUGER WAS IMPROPERLY ADMITTED.

---

[4] Because of the sequence of submissions in which the State filed the first notice of appeal, Chisolm is literally a cross-appellant. However, for sake of simplicity we will refer to him as an appellant, along with Cross.

14

POINT V

THE AGGREGATE SENTENCE OF [THIRTY-TWO] YEARS SUBJECT TO THE NO EARLY RELEASE ACT IS EXCESSIVE, AND RESENTENCING IS REQUIRED.

In his own brief, Cross makes similar arguments:

POINT I

DEFENDANT WAS DENIED THE RIGHT TO A FAIR TRIAL DUE TO ERRONEOUS JURY INSTRUCTIONS ON ACCOMPLICE LIABILITY.

POINT II

DEFENDANT WAS DENIED THE RIGHT TO A FAIR TRIAL DUE TO THE ERRONEOUS ADMISSION OF THE PRIOR STATEMENTS OF TYRONE FORD AND JAQUAN CAMPOS UNDER STATE v. GROSS.

POINT III

DEFENDANT'S CONVICTIONS FOR FIRST-DEGREE ROBBERY MUST BE VACATED BECAUSE THE INDICTMENT ONLY CHARGED DEFENDANT WITH SECOND-DEGREE ROBBERY.

POINT IV

THE COURT SHOULD HAVE GRANTED DEFENDANT'S MOTION FOR AN ACQUITTAL NOTWITHSTANDING THE VERDICTS BECAUSE THE VERDICTS ON THE TWO COUNTS OF

15

ATTEMPTED MURDER AND ROBBERY WERE AGAINST THE WEIGHT OF THE EVIDENCE.

POINT V

THE SENTENCES OF [SEVENTEEN] YEARS FOR THE ATTEMPTED MURDER AND THE CONSECUTIVE TERM OF [FIFTEEN] YEARS FOR ROBBERY, BOTH SUBJECT TO THE NO EARLY RELEASE ACT, WERE EXCESSIVE.

    A.   THE COURT DOUBLE-COUNTED AGGRAVATING FACTOR TWO.

    B.   THE COURT FAILED TO CONSIDER THE REAL-TIME CONSEQUENCES OF A NERA SENTENCE.

Further, the State argues in its own affirmative appeal in Chisolm:

POINT I

THE TRIAL COURT ERRED IN FAILING TO SENTENCE THE DEFENDANT TO A MANDATORY EXTENDED TERM UNDER THE GRAVES ACT.

After the briefs were filed, counsel at our request submitted supplemental letters confirming that the jury was not charged with conspiracy to commit murder or attempted murder, and that the verdict includes no such determination of guilt as to either defendant.

16                                                                                    A-2286-18

II.

The central issue for our consideration is whether defendants' respective convictions of attempted murder can stand. Based on the proofs and also the manner in which the jury was charged, we conclude those convictions must be set aside.

It is undisputed that neither police officer here was killed by gunfire, so without a death there was no murder. N.J.S.A. 2C:11-3. The proofs do suggest that Damon, who is now deceased, attempted to kill the officers by firing his gun at them. The pivotal question is whether Chisolm or Cross are criminally responsible for that attempt by Damon. Two alternative theories of culpability are discussed in the briefs: (1) conspiracy to commit, or attempt to commit, murder; or (2) accomplice liability for attempted murder.

We need not say much about the first possible theory, i.e., conspiracy to commit murder or attempted murder, because neither Chisolm nor Cross was found guilty by the jury of such a crime. The indictment charged both defendants with various conspiracies: specifically, conspiracy to commit weapons possession offenses (counts two and four); conspiracy to commit aggravated assault (count six); and conspiracy to commit robbery (count

twelve).  The jury acquitted defendants of the weapons conspiracies but found them guilty of the aggravated assault and robbery conspiracies.

Notably, the indictment did not charge the co-defendants with conspiracy to commit murder or attempted murder.  We recognize that during the charge conference, the assistant prosecutor requested the trial judge to instruct the jury that defendants could be liable as co-conspirators for attempted murder.  That request was based on a notion that such a conspiracy offense was a reasonably foreseeable "natural consequence" of a "common conscious purpose," consistent with the Supreme Court's interpretation of the conspiracy statute in State v. Bridges, 133 N.J. 447, 466-67 (1993).  After reflecting on the request, the judge apparently sent counsel an email that evening announcing that he was granting it.[5]  The next day, the prosecutor argued to the jury such a theory of conspiracy to commit murder, or attempted murder, during her closing argument.

The critical problem here is that the jury was never actually charged by the court with such a conspiracy crime, and the jury did not find defendants guilty of that offense.

---

[5] The email has not been provided in the record on appeal, but the transcript the following morning confirms the judge had decided overnight to give the requested conspiracy-to-murder charge.

The court's jury charge issued on June 19, 2018 does contain some generic references to the concepts of conspiracy and "natural consequences" of a conspiracy. A discussion of counts one through six followed, discussing both substantive offenses and conspiracy as to each of those non-murder offenses. But when the court continued onto the substantive attempted murder counts (seven and eight), there was no allied charge provided about conspiracy to commit murder or attempted murder. The reasons for this are unclear, but the omission is undisputed.

The verdict form contained no charges for conspiracy to commit attempted murder, even though the form contained charges for conspiracy to commit the unlawful possession of a weapon (count two), conspiracy to possess a weapon for an unlawful purpose (count four), conspiracy to commit aggravated assault (count six), and conspiracy to commit robbery (count twelve). Conspicuously absent from the verdict form are conspiracy charges tied to the two attempted murder counts (counts seven and eight).

The trial court offered counsel the opportunity to take exceptions to the final charge and jury verdict form, and no attorney objected on this basis.

When it rendered its verdict orally in open court on June 22, 2018, the jury found defendants guilty of the substantive offenses of attempted murder on

19

counts seven and eight. The jury did not render any verdict whatsoever on a conspiracy to commit murder or attempted murder.

Nor do defendants' respective judgments of conviction state anywhere that they were found guilty of conspiracy to commit murder or attempted murder.

In their supplemental letters to this court, counsel acknowledge that this is what occurred. They agree that, given how the jury was actually charged and the verdict form was worded, the sole legal and conceptual basis on which defendants could have been found guilty of attempted murder is a theory of accomplice liability.

Hence, the discussion in the parties' briefs about whether, as a matter of law under Bridges, a defendant can be found guilty of conspiracy to commit an attempt crime is an academic irrelevancy. No such conspiracy was charged or found here.

That brings us to the question of whether there was sufficient evidence here to find defendants guilty beyond a reasonable doubt of attempted murder as accomplices with Damon. The answer is no, because the record lacks proof that they shared with Damon, the shooter, any intent to kill or mortally wound the officers.

A-2286-18

N.J.S.A. 2C:5-1(a)(2) provides that a person is guilty of an attempt to commit a crime if he or she, "[w]hen causing a particular result is an element of the crime, does or omits to do anything with the purpose of causing such result without further conduct on his part." The Supreme Court has explained that while a defendant "may be guilty of murder if he or she intended to kill or was practically certain that his or her actions would cause or would be likely to cause death, the actor is guilty of attempted murder only if he or she actually intended the result, namely, death, to occur." State v. Rhett, 127 N.J. 3, 7 (1992). "An attempt is purposeful 'not only because it is so defined by statute, but because one cannot logically attempt to cause a particular result unless causing that result is one's "conscious object," the distinguishing feature of a purposeful mental state.'" State v. Jones, 242 N.J. 156, 169 (2020) (quoting State v. McCoy, 116 N.J. 293, 304 (1989)). An important element of attempt is that the "actor has taken a 'substantial step' toward the commission of the crime." Ibid.

Here, Damon shot an officer in the head and caused a brain injury. Damon plainly took a substantial step towards the commission of the substantive crime of murder. The attempted murder in this case by Damon was not a hypothetical, unrealized act of violence or a thwarted attempt to shoot or kill before the actor could actually do so. Rather, Damon fired his gun and severely injured a police

21

officer. He also fired his gun at the other officer, who fortunately was not struck, with an apparent comparable intent to take his life. See N.J.S.A. 2C:11-3 (defining murder).

As to these defendants, however, the pivotal issue is whether they were proven to be accomplices to Damon's attempted murder of the officers. N.J.S.A. 2C:2-6(c) provides:

> A person is an accomplice of another person in the commission of an offense if:
>
> (1) With the purpose of promoting or facilitating the commission of the offense; he
>
> > (a) Solicits such other person to commit it;
> >
> > (b) Aids or agrees or attempts to aid such other person in planning or committing it; or
> >
> > (c) Having a legal duty to prevent the commission of the offense, fails to make proper effort so to do; or
>
> (2) His conduct is expressly declared by law to establish his complicity.
>
> [N.J.S.A. 2C:2-6(c) (emphasis added).]

"By definition, an accomplice must be a person who acts with the purpose of promoting or facilitating the commission of the substantive offense for which he is charged as an accomplice." State v. Savage, 172 N.J. 374, 388 (2002)

(quoting State v. Bielkiewicz, 267 N.J. Super. 520, 527-28 (App. Div. 1993)). Accordingly, the trial court must instruct the jury that to find "a defendant guilty of a crime under a theory of accomplice liability, it must find that he 'shared in the intent which is the crime's basic element, and at least indirectly participated in the commission of the criminal act.'" Ibid. (quoting Bielkiewicz, 267 N.J. Super. at 528) (emphasis added). Proof beyond a reasonable doubt of such a shared intent is therefore critical.

Even viewing it in a light most favorable to the State, the record is bereft of sufficient evidence that Cross and Chisolm shared with Damon an intent to kill the officers he fired at. Chisolm, the companion wearing the green t-shirt, ran from the scene before Damon fired his gun. His police statement contained no admission that he saw Damon holding a gun. Cross, the man in the hoodie and white shirt, also denied knowing or perceiving that Damon was armed until he saw him motioning to the men on the ground. He, too, stated that he ran away before Damon fired the gun. Neither of the two victims told the police or testified at trial that they saw either co-defendant pointing or firing a gun at the officers, or assisting Damon in doing so.

Tellingly, during the charge conference, the assistant prosecutor acknowledged that "we're not alleging that [defendants Chisolm and Cross]

23

shared that common conscious purpose or object for attempted murder. We're claiming that based on State v. Bridges, that it was a reasonably foreseeable outcome based on the objective risks of the conspiracy." (Emphasis added).

On appeal, both defendants argue in their briefs that the State's evidence lacked sufficient proof of a shared intent to commit attempted murder and thereby they could not be guilty of accomplice liability for such a crime. The State's responding brief in Chisolm sidesteps the issue by noting he "can argue about the applicability of accomplice liability to the attempted murder, [but] it would certainly be applicable to the robbery and weapons offenses." The brief presents no reasoned argument to rebut Chisolm's point about a lack of shared intent to murder. Meanwhile, the State's brief in Cross similarly fails to identify proof of a shared intent on his part to commit or attempt to commit murder. The brief digresses into a discussion of Bridges and principles of a co-conspirator's liability for natural and foreseeable consequences of a proven conspiracy. But co-conspiracy and accomplice liability principles are different. State v. Samuels, 189 N.J. 236, 254 (2007) (explaining that the two concepts, although overlapping, are distinct).

In sum, there is simply no foundation in this case to support defendants' convictions for attempted murder. They were not charged or found by the jury

A-2286-18

to be co-conspirators who agreed to such homicidal act by Damon. Further, proofs of a shared intent to kill are absent, as the assistant prosecutor frankly acknowledged during the charge conference.

For these reasons, defendants' convictions for attempted murder must be vacated, and the final judgments revised accordingly.[6] In addition, each defendant must be resentenced in light of this determination. The cases are remanded for that purpose. We express no views on an appropriate sentence, bearing in mind that updated presentence reports are warranted under State v. Randolph, 210 N.J. 330, 350-52 (2012).

III.

None of the other issues raised on appeal by defendants warrant relief. We provide some brief remarks.

The trial court appropriately admitted for their truth the earlier police statements of Ford and Campos, the testifying robbery victims, pursuant to N.J.R.E. 803(a)(1) (allowing the admission of certain prior inconsistent

---

[6] In light of this disposition, we need not address defendants' argument that the jury charge was flawed by the occasional use of the term "and/or." See State v. Gonzalez, 444 N.J. Super. 62, 72-76 (App. Div. 2016) (disapproving of such verbiage because of its potential for ambiguity and juror non-unanimity), certif. denied, 226 N.J. 209 (2016) (cautioning the improvident use of "and/or" in the jury charge is not a per se basis to reverse a conviction).

statements by declarant-witnesses on cross-examination). We incorporate by reference and adopt the trial court's multi-factor analysis following the Gross hearings. We are unpersuaded by defendants' claims that these victims' accounts of what had occurred were patently unreliable. Although we recognize the points raised by defendants weighing against reliability, such as the victims' claims they had been intoxicated when they spoke with the police and the fact that Campos had been initially handcuffed, we do not find the trial court, who had the first-hand benefit of the Gross hearing, abused its discretion in admitting the statements. State v. Johnson, 421 N.J. Super. 511, 516-17 (App. Div. 2011).

In addition, defendants' confrontation rights were not violated. The victims provided some testimony about their encounter, and defense counsel had an opportunity to cross-examine them to some extent before they declined to elaborate further. State v. Slaughter, 219 N.J. 104, 117 (2014) (allowing prior inconsistent witness statements "so long as 'the witness feigns a loss of memory on the stand'") (quoting State v. Cabbell, 207 N.J. 311, 337 (2011)).

We discern no abuse of discretion in the court's admission of the expert testimony of Agent Hauger concerning the cellphone tower analysis. State v. Cole, 229 N.J. 430, 449 (2017). The expert's methodology was adequately explained to have a sound basis under N.J.R.E. 702, and it has not been

repudiated in other cases where it was presented and challenged on appeal. The expert was entitled to rely on the phone billing records as business records under N.J.R.E. 803(c)(6), and as "facts and data" reasonably utilized by others in the field. N.J.R.E. 703.

The State's proofs to support robbery, aggravated assault, and the other non-murder convictions were clearly ample. R. 3:18-1. Among other things, there was credible evidence that defendants, along with Damon, forced the victims to kneel on the ground and place their hands behind their heads, and attempted to take their belongings before the police interceded. The proofs manifestly showed an armed robbery in progress, backed by threats of serious bodily harm.

We reject defendants' argument that the indictment did not clearly place them on notice they were being charged with first-degree robbery, which is literally stated in the indictment even if not elaborated there. Defendants were duly informed as early as the probable cause hearings in 2016 that they were being charged with first-degree robbery. There was no lack of notice or any unfair surprise.

Because the cases must be remanded for resentencing, we need not address in detail the criticisms levied by defendants about the non-murder components

of the original sentences. We simply note for sake of completeness that defendants have failed to show the court abused its discretion in weighing the applicable aggravating and mitigating factors as to those facets. State v. Case, 220 N.J. 49, 65 (2014).

With respect to the State's appeal of the sentence in Chisolm, we agree that the trial court was obligated to impose an extended term upon him under the Graves Act, N.J.S.A. 2C:43-6(c). The jury on count five found Chisolm guilty of knowingly pointing a gun at or in the direction of another person, in violation of N.J.S.A. 2C:12-1(b)(4). That particular form of aggravated assault is one of the enumerated firearm offenses that is within the scope of the Graves Act. See N.J.S.A. 2C:43-6(c); see also State v. Soto, 385 N.J. Super. 247, 256 (App. Div. 2006). The act of pointing a gun logically entails possessing that gun.

The trial judge was mistaken in perceiving that the jury's verdict did not support a Graves Act consequence for Chisolm. Although the jury acquitted Chisolm on the first four counts of the indictment charging possessory offenses, the guilty verdict on count five suffices. In addition, the court's decision to merge the aggravated assault count into the robbery conviction does not

eliminate the Graves Act consequences.  Hence, on remand the trial court must take those consequences into account at resentencing.

Any further arguments presented lack sufficient merit to warrant discussion.  R. 2:11-3(e)(2).

Affirmed in part, reversed in part, and remanded for revision of the judgments of conviction and resentencing.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-2286-18